## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Aerospace Holdings, Inc., *et al.*,[1] | Case No. 17-10635 (_____) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF MATTHEW D. SEDIGH IN SUPPORT OF THE DEBTORS'
CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

**I, MATTHEW D. SEDIGH,** hereby declare, under penalty of perjury, as follows:

1.      I am a Director at Conway MacKenzie, Inc. ("**Conway**").  I have approximately ten years of experience advising the boards of directors and senior management of troubled companies and creditor constituencies in both operational and financial restructurings.  I have also assisted in managing and administering companies during the chapter 11 process.

2.      Conway has been acting as the chief restructuring advisor (the "**Chief Restructuring Advisor**") to the above captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**") since December 29, 2016.  As Chief Restructuring Advisor, Conway, (i) assisted the Company's restructuring process, (ii) assisted in the development and evaluation of restructuring and other strategic alternatives, including the marketing process of the Company and the Company's assets for sale by the Company's investment banker, G2 Capital Advisors, LLC ("**G2**"), (iii) assisted in the review and analysis of proposals for the purchase of the Company or the Company's assets, (iv) negotiated with lenders, vendors, suppliers and other

---

[1]     The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number are:  Aerospace Holdings, Inc., 366 Madison Avenue, 9th Floor, New York, NY 10017 (4318); Valley Tool & Manufacturing, Inc., 22 Prindle Hill Rd., P.O. Box 564, Orange, CT 06477 (8614); NC Dynamics Incorporated, 6925 Downey Avenue, Long Beach, CA 90805 (3219); NCDI Mexico, Inc., 2771 Centerville Road, Suite 400, Wilmington, DE 19808 (5905); and GroupAero Seattle, Inc., 7020 S. 238th Street, Kent, WA 98032 (7033).

stakeholders, (v) assisted the Company in developing, implementing, and overseeing cash management strategies, (vi) supported the Company's Chief Financial Officer, (vii) assisted management in the development and revision of business plans and related forecasts, (viii) assisted the Company in preparing and analyzing operating and financial budgets, and (ix) provided the Company such other services as requested by the Company.

3.       On March 8, 2017, I was appointed as the Chief Restructuring Officer of the Company.  As the Chief Restructuring Officer, I am responsible for managing the operations of the Debtors and assisting with the restructuring process under the supervision of the Board of Directors for each of the Companies.  I perform my duties out of NC Dynamics Inc.'s ("**NCDI**") headquarters, located at 3401 E. 69th Street, Long Beach, California 90805.

4.       I submit this declaration (the "**First Day Declaration**") in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions (the "**First Day Motions**") filed on or shortly after the date hereof (the "**Petition Date**").[2]

5.       On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

6.       Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and financings,

---

[2]   All capitalized terms used herein, but otherwise not defined, shall have the meanings set forth in the relevant First Day Motion.

2

information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

7.      Part I of this First Day Declaration provides a brief overview of the Debtors and a summary of these chapter 11 cases.  Part II of this First Day Declaration describes in more detail the Debtors' businesses, the developments which led to the Debtors' chapter 11 filings and the Debtors' goals during these chapter 11 cases.  Part III sets forth the relevant details of the various First Day Motions.

## I.  INTRODUCTION

8.      The Debtors design and manufacture a wide variety of products, including machined parts, fabricated components, and tooling for the commercial aerospace and defense markets.  Collectively, the Debtors encompass a full spectrum of precision manufacturing capabilities for any scale, from individual prototypes to large lot production.

9.      The Debtors' secured debt obligations were originally set to mature in June 2016. The final maturity date was extended to July 29, 2016 pursuant to an amendment to the Prepetition Credit Agreement (defined below).  Due to the impending maturity of the Prepetition Credit Agreement and certain operational issues, caused in part by the impending final maturity of the Debtors' secured obligations, the Debtors retained G2 in July 2016 to, among other things, review and analyze the Debtors' business and financial projections and advise and assist the Debtors in evaluating potential financing or sale transactions.  Despite the final maturity of the Prepetition Credit Agreement, Comerica Bank continued to work with the Debtors and fund their

operations through protective advances pursuant to amendments to the Prepetition Credit Agreement.  Over the course of the last eight (8) months, G2 engaged in an extensive marketing process to (i) structure a refinancing solution to refinance the Debtors' secured debt obligations or (ii) locate a potential buyer for all, or substantially all, of the Debtors' assets.

10.    The Debtors pursued a number of potential refinancing transactions and potential sale transactions while G2 continued to market the Debtors' businesses.  During this process, certain of the Debtors' existing investors also worked with G2 to develop an internal restructuring plan to recapitalize the Debtors' balance sheet.  On February 24, 2017, Harlow Aerostructures LLC ("**Harlow**"), a strategic competitor of the Debtors, purchased the senior secured debt from Comerica Bank and Fifth Third Bank to facilitate a transaction.

11.    After February 24, 2017, Harlow funded the Debtors' operations while the Debtors and Harlow negotiated the material terms of a transaction.  Pursuant to the Asset Purchase Agreement by and between the Debtors and Harlow (the "**Stalking Horse Agreement**") and the Loan and Security Agreement between the Debtors and Harlow (the "**DIP Credit Agreement**") (i) the Debtors have commenced these chapter 11 cases, (ii) Harlow will provide the Debtors' debtor-in-possession financing, (iii) the Debtors will continue their marketing efforts post-petition, (iv) the Debtors will obtain entry of an order approving bidding procedures, (v) Harlow will act as the stalking horse bidder, (vi) subject to higher or better offers, Harlow or another high bidder will acquire substantially all of the Debtors' assets and (vii) the Debtors will obtain entry of an order approving the sale.

12.    The Debtors commenced these chapter 11 cases to effect an expeditious sale transaction with Harlow or any other party that submits a higher or otherwise better bid and hope to conduct an expeditious, but orderly, winddown of their estates.

## II. BACKGROUND

### A. **General Background**

13.    Aerospace Holdings, Inc. ("**Aerospace**") was formed in 2010 to build a leading aero-structures business by acquiring small and separate fabrication and machining enterprises and to integrate those companies under one corporate umbrella to facilitate branding strategies, to promote cross-selling opportunities and to leverage customer relationships across platforms. Aerospace believed that the growth in commercial air traffic combined with the aging of global commercial aircraft fleets would lead to a growth in demand for commercial aircraft, and sought to take advantage of industry outsourcing trends by leveraging the customer relationships and manufacturing capabilities of its divisions.

14.    Stadco Inc. ("**Stadco**") was founded in 1941 and was acquired by Aerospace in June 2010.  At the time of acquisition, net sales exceeded $22 million and its EBITDA exceeded $4.7 million. Stadco and its subsidiaries were a leading designer and manufacturer of precision, close tolerance, large-scale, flight-critical machined parts and tooling for the aerospace and defense market.  At the time of acquisition, Stadco had developed an outstanding 70-year long reputation among a wide variety of commercial and military customers for producing cost-efficient, precision engineered solutions for machined parts and tooling.  With its expertise in complex components and large tooling, Stadco was a trusted supplier to the leading original equipment manufacturers as well as the major aerospace and defense suppliers.  Stadco was one of a select few suppliers that was qualified to produce large, complex, flight-critical machined parts and tooling, performed a critical role in support of space, military and commercial applications, including the Ares rocket launch vehicles, the Airbus A-380 passenger jet, the Boeing 787 Dreamliner, D, E, or K variants of the CH-54 helicopter, F-35 Joint Strike Fighter

and unmanned aerial vehicles, including the Navy Unmanned Combat Air System.   Aerospace divested Stadco and its subsidiaries in November 2014.

15.     Valley Tool & Manufacturing, Inc. ("**Valley**") was formed in 2006 from the merger of Mauer Metalcraft, Inc. and New England Manufacturing Group, Inc., which allowed Valley to combine customer vendor codes and to expand the products offered to the commercial aerospace and defense industry.   Aerospace acquired Valley in September of 2010 and at the time of acquisition, Valley's net sales exceeded $13.5 million and its EBITDA exceeded $6.5 million.   Valley operates a facility in Orange, Connecticut and primarily focuses on the machining and fabrication of sheet metal parts, such as doorframes, dashboards and hinges, as well as small-machined components for military and commercial rotary wing aircrafts.   Valley also possesses tube-bending capabilities (up to 40 mm in diameter) that are used in the manufacturing of nozzles and tubing.   Valley has developed a reputation as a "build to design" manufacturer and excels at developing the capability to adapt each product to fit a specific customer's needs.   Due to Valley's flexibility and commitment to its products, Valley has engrained itself as a key supplier of parts to high-priority military and commercial programs.

16.     NCDI was founded in 1979 and engineers, manufactures and assembles sophisticated metallic machined structures for the commercial aerospace and defense industry. Aerospace acquired NCDI in March 2012 and at the time of acquisition, NCDI's net sales exceeded $24 million and its EBITDA exceeded $5.3 million.   NCDI specializes in monolithic components and assemblies manufactured from "hard metals" such as titanium, stainless steel alloys and high strength aluminum.   NCDI offers multi-axis machining along with precision component assembly.   NCDI operates its business from a 118,000 square foot facility in Long Beach, California.   Due to NCDI's expertise and experience, NCDI has been a key supplier for a

6

number of commercial aerospace platforms, including the Airbus A320, Boeing 737, Boeing 787, Bombardier C-Series and Mitsubishi Regional Jets as well as a key supplier to several defense platforms including the F-16, F-18, F-35 JSF, C-5 Galaxy and Apache AH-64.

17.    GroupAero Seattle, Inc., formerly Aerospace Multiaxis Machining, Inc. ("**GroupAero Seattle**") was acquired by Aerospace in late 2012. GroupAero Seattle was acquired to expand the Company's relation with a key customer located in Washington; however, the Company was unable to materially expand the relationship and managing a division in Seattle proved challenging. As a result, GroupAero Seattle's assets were sold at auction in 2014.

18.    As of the Petition Date, the Debtors' operations employ in excess of 220 employees.

**B. The Debtors' Prepetition Organizational Structure**

19.    Aerospace is a Delaware corporation that directly or indirectly owns all of the other Debtors. Valley and NCDI Mexico, Inc. are both Delaware corporations. NCDI is a California corporation and GroupAero Seattle is a Washington corporation. Valley operates its business from its headquarters in Orange, Connecticut and NCDI operates its business from its headquarters in Long Beach, California. The corporate organizational structure of the Debtors is depicted on the chart annexed hereto as **Exhibit A**.

**C. Prepetition Capital Structure**

20.    As of the Petition Date, the Debtors have outstanding debt obligations in the aggregate principal amount of approximately $92.8 million, consisting primarily of (a) approximately $38.6 million of secured debt under the Prepetition Credit Agreement (as defined below) (b) approximately $27.1 million under a subordinated credit facility,

7

(c) approximately $21.6 million under various subordinated promissory notes and (d) approximately $5.5 million owed to vendors, landlords and other unsecured creditors.

### i.    *The Prepetition Credit Agreement*

21.    On March 5, 2012, the Debtors, in their capacity as borrowers (the "**Prepetition Borrowers**"),[3] entered into that certain Second Amended and Restated Revolving Credit and Term Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Credit Agreement**") with the lenders party thereto from time to time (the "**Prepetition Lenders**") and Harlow, as successor to Comerica Bank, as administrative agent (in such capacity, together with its successors and permitted assigns, the "**Prepetition Agent**"), which provided the Debtors with (i) a revolving line of credit facility (the "**Revolver**"), (ii) a term loan facility (the "**Term Loan**"), (iii) a swing line facility (the "**Swing Line**"), and (iv) a Capex loan facility (the "**Capex Facility**" and, collectively with the Revolver, the Term Loan, and the Swing Line, the "**Bank Debt**").

22.    As of the Petition Date, the Revolver had an outstanding balance of approximately $11.1 million, consisting of principal of approximately $10.2 million, accrued and unpaid interest of approximately $1.0 million, and prepetition fees and expenses (collectively, the "**Prepetition Revolver Obligations**").  As of the Petition Date, the Term Loan had an outstanding balance of approximately $24.7 million, consisting of principal of approximately $22.2 million, accrued and unpaid interest of approximately $2.5 million, and prepetition fees and expenses (collectively, the "**Prepetition Term Loan Obligations**").  As of the Petition Date, the Capex Facility had an outstanding balance of approximately $2.8 million, consisting of principal of $2.5 million, accrued and unpaid interest of approximately $0.3 million, and

---

[3] GroupAero Seattle was joined in December 2012 when it was acquired by Aerospace.

prepetition fees and expenses (collectively, with the Prepetition Revolver Obligations and the Prepetition Term Loan Obligations, the "**Prepetition Obligations**").    The Prepetition Obligations continue to accrue interest from and after the Petition Date at the default rate provided for in the prepetition loan documents, as well as fees and expenses after the Petition Date (such obligations, including postpetition default interest, together with the Prepetition Obligations, the "**Bank Debt Obligations**").[4]

23.    Pursuant to that certain Second Amended and Restated Security Agreement dated as of March 5, 2012 (the "**Security Agreement**") by and among the Prepetition Borrowers and the Prepetition Agent, the Bank Debt Obligations are secured by valid, properly perfected and unavoidable first priority security interests in and liens on (the "**Prepetition Liens**") all of the Prepetition Borrowers' right, title and interest in and to the following, whether now owned or hereafter acquired and wherever located: all accounts; all chattel paper; all general intangibles; all equipment; all inventory; all documents; all instruments; all deposit accounts and other cash collateral, deposit or investment accounts, including all cash collateral, deposit or investment accounts established or maintained pursuant to the terms of the Security Agreement or the other prepetition loan documents; all computer records and software, whether relating to any of the Prepetition Collateral (as defined below) or otherwise, subject to the rights of any non-affiliated licensee of software; all investment property; proceeds, in cash or otherwise, of the property described in this sentence; and all liens, security, rights, remedies and claims of each Debtor with respect thereto (collectively, the "**Prepetition Collateral**"); provided, however, that the Prepetition Collateral does not include any Restricted Assets (as defined in the Security Agreement), but does include any proceeds of the Restricted Assets.

---

[4] As of the Petition Date, no amounts were due on the Swing Line.

*NY 246430506v1*

### ii.    *Subordinated Credit Agreement*

24.    On March 5, 2012 the Debtors entered into that certain Second Amended and Restated Subordinated Term Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Subordinated Credit Agreement**") with the lenders party thereto from time to time (the "**Subordinated Lenders**") and Brookside Mezzanine Agent, LLC, as administrative agent.  As of the Petition Date, approximately $27.1 million was outstanding under the Subordinated Credit Agreement.  The obligations evidenced by the Subordinated Credit Agreement are unsecured and the exercise of any right or remedy with respect to the Subordinated Credit Agreement and the rights of the Subordinated Lenders are subject to the provisions of that certain Amended and Restated Subordination Agreement (as amended, restated, supplemented, or otherwise modified from time to time) dated as of March 5, 2012, by and among the Prepetition Agent, the Subordinated Lenders and acknowledged by the Debtors (the "**Subordination Agreement**").

### iii.    *Subordinated Notes*

25.    The Debtors are also party to a number of unsecured subordinated promissory notes with certain of the Debtors' equity holders and the former owners of certain of the Debtors' businesses (collectively, the "**Promissory Notes**").  The Promissory Notes are subject to the Subordination Agreement.  As of the Petition Date, approximately $21.6 million was outstanding under the Promissory Notes.

### iv.    *Other Unsecured Debt*

26.    As of the Petition Date, the Debtors estimate that they have approximately $5.5 million in unsecured debt consisting primarily of $5.3 million of trade debt owed to hundreds of vendors and approximately $0.2 million owed to landlords.

v.    *Equity Interests*

27.    Aerospace, a Delaware corporation, owns 100% of the equity interests in (i) Valley, a Delaware corporation, (ii) NCDI, a California corporation and (iii) GroupAero Seattle, a Washington corporation.  NCDI owns 100% of the equity interests in NCDI Mexico, Inc., a Delaware corporation.  The equity interests of Aerospace are held by several private equity investors, institutional investors, members of management and other individuals.

**D.  Events Leading up to these Chapter 11 Cases**

28.    A series of factors have contributed to the Debtors' operational challenges and ultimately resulted in the need to file these chapter 11 cases, including those discussed below in more detail.  In summary, the Debtors' ability to build a leading aero-structures business was hampered by unfortunate and unforeseeable circumstances which (i) drastically impaired the Debtors' ability to continue to grow through the acquisition of small and disparate fabrication and machining enterprises and (ii) limited the Debtors' opportunities to grow through the development of existing customer relationships.

29.    Aerospace's first acquisition was Stadco, a company founded in 1941 that developed an outstanding reputation among a wide variety of commercial and military customers.  However, a significant portion of Stadco's profitability related to two projects which were cancelled or drastically reduced shortly after Aerospace's acquisition: (i) the Lockheed Martin F-22 fighter jet and (ii) the Airbus A380.  Due to the cancellation of these programs, and the resulting impact on Stadco's operations and balance sheet, Stadco caused a significant drain on management, negatively impacted Aerospace's balance sheet, constrained liquidity, hampered Aerospace's ability to identify other potential growth opportunities and caused significant turnover of key employees.  As a result, in 2014 Aerospace divested Stadco at a significant loss.

30.     Shortly after acquiring Stadco, Aerospace acquired Valley.  In 2014, as Aerospace was divesting Stadco, Valley's key customer was acquired by a global security and aerospace company, which resulted in fewer orders during that acquisition process.  Approximately ninety percent (90%) of Valley's business is derived from that customer and is closely related to demand for military rotorcraft.  While Valley maintains a sterling reputation and an excellent relationship with its customers, Valley is beholden to military spending to create demand for its products.  As a result, the reductions in military spending from 2014 to 2016 negatively impacted Valley's growth.

31.     Aerospace acquired NCDI in the first quarter of 2012. While NCDI maintains a strong reputation and relationship with its customers, the issues caused by the cancellation of the Stadco programs negatively impacted NCDI's ability to effectively operate.  One of NCDI's key customers is extremely rigid in evaluating its suppliers balance sheets, which, following the cancellation of the Stadco programs, has hampered NCDI's ability to win new contracts and further grow that relationship.   In addition, NCDI's operations have been impacted by the aforementioned reduction in military spending.  NCDI derives nearly all of its revenues from certain commercial and military programs to develop and support various aircraft systems. As an example, the Lockheed C-5 Galaxy program had historically provided as much as 25% of NCDI's annual revenues.  Since 2014, NCDI has experienced a significant decline in revenue due in large part to the cancellation of the C-5 program.

32.     Finally, in late 2013, Aerospace acquired GroupAero Seattle, to establish a presence in Washington and further develop a relationship with a global aerospace company and leading manufacturer of commercial jetliners and defense, space and security systems.  Despite Aerospace's efforts, that relationship failed to materialize and managing a division in

12

Washington proved challenging.  As a result, GroupAero Seattle's assets were sold at auction in 2014.

33.     Despite these challenges, Valley and NCDI continue to foster a stable relationship with their existing customers and continue to strive to maintain the high standard of workmanship that their customers demand and expect.

34.     In sum, these chapter 11 cases are the result of the Debtors' liquidity constraints caused by the unexpected cancellation of two long term projects and reduced defense spending, which significantly impacted the Debtors' balance sheet, impaired their ability to grow through acquisition, hampered their ability to improve existing customer relationships, caused significant turnover in management and limited the Debtors' opportunities to successfully refinance or restructure their indebtedness.  Due to these challenges the Debtors were unable to refinance or otherwise pay the Prepetition Obligations when they matured.  With the assistance of Comerica Bank, the Debtors engaged in an extensive prepetition marketing process which resulted in Harlow acquiring Comerica Bank's interest in the Prepetition Obligations to effect a transaction through these chapter 11 cases.

### E.  *Debtors' Goals in These Chapter 11 Cases*

35.     The Debtors have two goals in these chapter 11 cases: (i) conduct a swift yet fulsome sale process and effectuate a sale as required by the Asset Purchase Agreement and DIP Credit Agreement and (ii) secure an effective and efficient winddown of their estates.

### III.     FIRST DAY MOTIONS

36.     Below is an overview of the First Day Motions. The First Day Motions seek relief intended to facilitate a smooth transition for the Debtors into these chapter 11 cases and minimize disruptions to the Debtors' business operations. Capitalized terms used but not otherwise defined

in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions.

**A.  Motion for Entry of an Order Directing Joint Administrative of Related Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b)**

37.     By this motion, the Debtors request the joint administration of the chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for the chapter 11 cases under the Aerospace case and also request that the caption of each of the chapter 11 cases be modified to reflect the joint administration of the chapter 11 cases.  Additionally, the Debtors request that the Court authorize the Debtors to use a combined service list for the jointly administered chapter 11 cases for purposes of noticing creditors of the Debtors' estates.

38.     Valley; NCDI; NCDI Mexico, Inc.; and GroupAero Seattle are direct and indirect subsidiaries of Aerospace, such that the Debtors constitute "affiliates" of one another within the meaning of section 101(2) of the Bankruptcy Code.  Joint administration of the chapter 11 cases will avoid the unnecessary administrative burden on the Court and parties-in-interest in these chapter 11 cases.

39.     Moreover, joint administration will permit the Clerk to use a single general docket for the Debtors' chapter 11 cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.  Joint administration will protect parties-in-interest by ensuring that such parties will be apprised of the various matters before the Court in each of the chapter 11 cases.

40.     I understand that if the Court approves joint administration of the Debtors' chapter 11 cases, the Debtors will be able to reduce fees and costs resulting from the administration of these chapter 11 cases and ease the onerous administrative burden of having to

14

file multiple documents.  I have also been advised that joint administration will ease the administrative burden for the Court and all parties to the chapter 11 cases and obviate the need for duplicative notices, motions, applications, and orders, thereby saving the Debtors and their estates time and money.

41.    Based on the foregoing, I believe that joint administration of the chapter 11 cases is in the best interests of the Debtors, their estates, and all parties-in-interest, and should be granted in all respects.

**B. Motion of the Debtors for Entry of an Order Authorizing the Debtors to File (I) A Consolidated Master List of Creditors and (II) A Consolidated List of the Debtors' Twenty Largest General Unsecured Creditors**

42.    By the motion, the Debtors seek authority to file (i) a consolidated list of the Debtors' creditors and (ii) a consolidated list of the Debtors' twenty (20) largest general unsecured creditors, exclusive of insiders.

43.    Pursuant to Local Rule 1007-2, the Debtors are obligated to file, with their petitions, a list containing the name and address of each of their respective creditors. Additionally, Local Rule 2002-1(f)(v) requires each debtor in jointly administered cases to maintain a separate creditor mailing matrix.  However, Local Rule 1001-1(c) permits modification of the Local Rules by the Court "in the interests of justice."

44.    The Debtors maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in these chapter 11 cases.  The Debtors believe these lists may be consolidated and utilized efficiently to provide interested parties with notices and other similar documents, as contemplated by Local Rule 1007-2.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and could result in

duplicate mailings.  The Debtors submit that permitting them to file a consolidated list of creditors, rather than filing a separate creditor matrix for each Debtor, is warranted.

45.     Additionally, Bankruptcy Rule 1007(d) requires a chapter 11 debtor to file, with its petition, a list identifying the names, addresses, type and claim amounts of creditors, exclusive of insiders, with the twenty (20) largest unsecured claims in the debtor's case.  The Debtors submit that a single, consolidated list of their combined twenty (20) largest general unsecured creditors in these chapter 11 cases would be more reflective of the body of unsecured creditors that have the greatest stake in these chapter 11 cases.

46.     I believe such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these chapter 11 cases.

**C.  Motion of the Debtors for Entry of an Order Authorizing (I) the Debtors to Pay Prepetition Property Taxes and Regulatory Fees in the Ordinary Course of Business and (II) Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

47.     In connection with the normal operations of their businesses, the Debtors pay property taxes to certain state and local taxing authorities and regulatory fees to certain federal and state regulatory authorities.

48.     Specifically, the Debtors incur real property taxes in jurisdictions in which they operate in the ordinary course of business.  Failure to pay the Taxes can result in the attachment of statutory liens on property that is critical to the Debtors' operations.  Additionally, the failure to pay the Taxes may result in the imposition of penalties and interest that could exceed 20% per annum.  The Debtors estimate that they owe approximately $105,000 of Taxes as of the Petition Date.

49.     Among other things, the Debtors manufacture and supply parts, components and structures utilized in the United States aerospace and defense industry.  As such, the Debtors are

required to register with an agency of the federal government that regulates the import and export of defense-related articles and services; the majority of the Regulatory Fees the Debtors incur consists of the registration fees with this agency.  Furthermore, the Debtors incur fees in connection with their use of commercial vehicles in the ordinary course of business.  The Debtors estimate that they owe approximately $2,500 of Regulatory Fees as of the Petition Date.

50.    By the motion, the Debtors seek authority to pay prepetition Taxes and Fees owed to the Taxing and Regulatory Authorities, provided that the aggregate amount of such payments shall not exceed $150,000.  In addition, the Debtors also seek authorization to honor (i) all checks that remain uncashed prior to the Petition Date or that are otherwise returned by a Taxing or Regulatory Authority as well as (ii) those Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

51.    There are a number of bases for granting the relief requested in this motion, including:  (i) governmental entities might sue the Debtors' directors and officers for certain unpaid Taxes and Fees, distracting them unnecessarily from the Debtors' efforts in these chapter 11 cases; (ii) portions of the Taxes and Fees may be entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code; (iii) section 363 of the Bankruptcy Code gives the Debtors authority to remit payment on account of such Taxes and Fees in the ordinary course of business and (iv) section 105 of the Bankruptcy Code and the Court's general equitable powers permit the Court to grant the relief sought.

52.    Nonpayment of these obligations may cause Taxing and Regulatory Authorities to take precipitous action, which could include filing liens, interfering with or withdrawing concessions, preventing the Debtors from conducting business in applicable jurisdictions and seeking to lift the automatic stay, all of which could disrupt the Debtors' day-to-day operations

17

and impose significant costs on the Debtors' estates and destroy the going concern value of the Debtors' business.  Therefore, I believe it is in the best interests of the Debtors, their creditors and other parties-in-interest for the Court to grant the relief requested.

**D.  Motion of the Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (II) Deeming Utility Providers Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Adequate Assurance of Payment**

53.    In connection with the operation of their businesses and management of their estates, the Debtors obtain electricity, gas, water, sewer, internet, telephone, and other similar services from a number of utility companies.

54.    In the ordinary course of business, the Debtors regularly incur utility expenses for the Utility Services.  The Debtors have a long and established payment history with most or all of the Utility Providers.  The Debtors' aggregate average monthly cost for the Utility Services is approximately $62,000.

55.    The Debtors intend to pay all postpetition obligations and expect that revenues generated from their business operations and/or funds from their DIP financing facility and/or cash collateral will be sufficient to pay all undisputed postpetition obligations owed to the Utility Providers in a timely manner.  To provide adequate assurance of payment for future services to the Utility Providers the Debtors propose to deposit an initial sum equal to the Debtors' estimated average cost for two (2) weeks of Utility Services into a segregated account.  Because the Debtors' average spending on Utility Services is approximately $62,000, the Debtors propose that the Adequate Assurance Deposit should be approximately $31,000.

56.    Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their respective estates could be severely and irreparably harmed.  Any interruption of the Utility Services would disrupt the

Debtors' ability to operate and maintain their businesses and would thereby negatively affect the Debtors' customer relationships, revenues and profits. Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, their value and constituent recoveries. It is therefore critical that the Utility Services continue uninterrupted.

57.    By the motion, the Debtors request a determination that their Utility Providers have been provided with adequate assurance of future payment and that the Debtors are not required to provide any additional adequate assurance. Additionally, the Debtors request the Court approve the Debtors' proposed adequate assurance procedures. Lastly, the Debtors request the Court prohibit the Utility Providers from altering, refusing or discontinuing the provision of Utility Services due to outstanding prepetition amounts.

**E. Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Maintain Existing Insurance Policies, Pay All Policy Premiums and Broker Fees Arising Thereunder and Renew or Enter Into New Policies, and (B) Continue Insurance Premium Financing Programs, Pay Insurance Premium Financing Obligations Arising in Connection Therewith and Renew or Enter into New <u>Premium Financing Arrangements</u>**

58.    In the ordinary course of business, the Debtors maintain numerous insurance policies with various insurance companies providing coverage for, *inter alia,* general liability, excess liability, automobiles, property, and workers' compensation.

59.    The Policies are essential to continue to operate the Debtors' businesses. Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtors' efforts to preserve and maximize the value of their estates. Moreover, the U.S. Trustee Operating Guidelines require the Debtors to maintain insurance coverage through the pendency of their chapter 11 cases.

60.    The Debtors finance the premiums on certain of the Policies pursuant to four (4) premium financing agreements, three (3) with FIRST Insurance Funding Corp. and one (1) with

AFCO Acceptance Corporation.   Pursuant to the PFAs, the Debtors' obligations to First Insurance and AFCO are collateralized by security interests in all insurance policies financed through the respective PFAs.   Therefore, if the Debtors are unable to make payments under the PFAs, First Insurance and AFCO may be permitted to terminate certain of the Policies to recoup losses.   Furthermore, if the Debtors cease making payments on the Policies, the Debtors may be required to obtain replacement insurance on an expedited basis and at great cost to their estates.

61.    Furthermore, The Debtors do not have any dedicated, in-house insurance professionals and rely on the services of the insurance brokers to assist the Debtors with obtaining and maintaining the Policies.   In the event the Debtors were unable to pay the broker fees, it is likely that the Debtors would lose the services of knowledgeable agents and be forced to find other entities willing to serve as their agent.

62.    Although the Debtors believe that no prepetition amounts are due and owing to the Insurance Companies, by the motion, the Debtors request authorization to pay all policy premiums and broker fees arising thereunder, whether prepetition or postpetition, and renew or enter into new policies as needed and to continue insurance premium financing under the Debtors' premium financing agreements, pay insurance premium financing obligations arising thereunder or in connection therewith and renew or enter into new premium financing agreements as needed when the existing arrangements expire, without further order of the Court.

### F.  Motion of Debtors for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Claims of Materialmen in the Ordinary Course of Business

63.    As part of their business operations, the Debtors rely on a variety of Materialmen to provide finishes, designs or other features that add value to certain of the Debtors' manufactured goods.   The Debtors seek authority pay certain Materialmen to the extent necessary to satisfy non-disputed prepetition Lien Claims and to satisfy any potential, asserted,

or actual possessory liens, if any, on the goods that may be held by any Materialmen pending the payment of such charges.  Such payments are not expected to exceed approximately $100,000.

64.    The Debtors will only pay Lien Claims where they believe, in their business judgment, benefits to their estates and creditors from making such payments would exceed (a) the costs that their estates would incur by bringing an action to compel the turnover of such goods, and (b) the delays associated with such actions.  The Debtors also request entry of an order authorizing banks and other financial institutions to rely on the Debtors' direction to pay amounts authorized under the motion, provided there are sufficient funds available in the Debtors accounts.

65.    As it is vital to the Debtors' business operations and reorganization efforts to retrieve their goods that are held by Materialmen on account of prepetition claims for value-added services provided by such Materialmen, I believe the Court should grant this request, and authorize the Debtors to pay certain Materialmen in full and final satisfaction of claims giving rise to potential Liens on the Debtors' property.

**G. Motion of the Debtors for Entry of an Order (I) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (II) Authorizing the Continued Use of Existing Cash Management System, (III) Waiving Certain Investment and Deposit Guidelines, (IV) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (V) Granting Related Relief**

66.    Prior to the commencement of these chapter 11 cases, and in the ordinary course of business, the Debtors maintained approximately 7 Bank Accounts.  The Debtors' cash management system is primarily maintained at Comerica Bank with one (1) account maintained at The Milford Bank.  A summary of the Debtors' Cash Management System follows:

      a.    <u>Credit Card Restraint Account</u>:  The Debtors maintain one (1) credit card restraint account (the "**Credit Card Restraint Account**") with Comerica that holds a $10,000 cash collateralized credit limit on company credit cards used at Valley and NCDI, respectively, for business expenses.

21

NCDI receives all of the credit card statements and uses the Credit Card Restraint Account to pay statement balances off every day through NCDI accounts payable.

b.     Concentration Account:    The Debtors used to maintain one (1) concentration account (the "**Concentration Account**") with Comerica. The Concentration Account was a zero balance account that was used for automatic and manual daily sweeps to and from the Debtors' two (2) Lockbox Accounts (as defined below).  This account is no longer in use.

c.     Cash Collateral Holding Account:    The Debtors maintain one (1) cash collateral account (the "**Cash Collateral Holding Account**") with Comerica.   When liquidity is requested, the Debtors' senior lender, Harlow Aerostructures LLC, transfers funds to the Cash Collateral Holding Account.   A zero balance is kept in the Cash Collateral Holding Account, so after a request is made, the funds transferred from the senior lender to the Cash Collateral Holding Account are manually swept to the Debtors two (2) Lockbox Accounts to satisfy liquidity needs.

d.     Manual Payroll Check Account: The Debtors maintain one (1) manual payroll check account (the "**Manual Payroll Check Account**") that is a just-in-time payroll account.   Funds are manually transferred into the Manual Payroll Check Account from NCDI's Lockbox Account.   The Manual Payroll Check Account is used to pay termination checks, missed wage true-ups, etc. and holds enough funds to cover outstanding checks.

e.     Lockbox Account:    Valley and NCDI each have their own lockbox account (the "**Valley Lockbox Account**" and the "**NCDI Lockbox Account**", respectively, and collectively, the "**Lockbox Accounts**") with Comerica.    The Lockbox Accounts are deposit and check-writing accounts.    The Lockbox Accounts receive deposits, process business checks, process incoming and outgoing wire transfers, and automated clearinghouse debits.   Additionally, the Lockbox Accounts are used to process Debtor Aerospace Holdings, Inc. ("**AHI**") payables.  Furthermore, NCDI's payroll processor, ADP, LLC ("**ADP**") debits the NCDI Lockbox Account for NCDI's bi-weekly payroll and Valley's payroll processor, Paychex, Inc., debits the Valley Lockbox Account for Valley's weekly payroll.

f.     Checking Account:  Valley has one (1) checking account (the "**Checking Account**") with Milford that is used for local payments, check deposits, miscellaneous deposits and checks, such as scrap receipts, and to fund 401(k) obligations.

67.     The Debtors typically reconcile cash receipts and cash disbursements on a daily basis, and also generally reconcile all of the deposits and debits in the Cash Management System on a daily basis, resolving any exceptions by the close of each month.  The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of the Chapter 11 Cases with the same account numbers and, where applicable, automated relationship.  The Debtors also seek authority to deposit funds in and withdraw funds from all such accounts postpetition, including, but not limited to, checks, wire transfers, ACH, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

68.     Also, in the ordinary course of business, the Debtors use pre-printed check stock with the relevant Debtor's name printed thereon.  In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials and other business forms.  I understand that the Debtors will be able to minimize administrative expense and delay if they could continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

69.     Furthermore, the Debtors maintain business relationships among each other that give rise to intercompany claims.   The Debtors maintain records of their Intercompany Transactions, and thus, can ascertain, trace and account for their Intercompany Transactions. The Debtors reconcile all Intercompany Transactions on a monthly basis and will continue to maintain records and appropriately reconcile all Intercompany Transactions postpetition.  If these Intercompany Transactions are discontinued, the Debtors' cash management process would be disrupted causing irreparable harm to the Debtors.

23

**H. Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay (I) All Prepetition Employee Obligations and (II) Prepetition Withholding Obligations, and (B) Directing Banks to Honor Related Transfers**

70.     In order to enable the Debtors to maintain morale during this critical time, retain their current Employees and Independent Contractors and minimize the personal hardship such Employees and Independent Contractors may suffer if prepetition employee-related obligations are not paid when due or honored as expected, the Debtors, by this motion, seek authority, in their sole discretion, to pay and honor, as the case may be, (a) all prepetition claims of Employees, including, but not limited to, claims for Wages and PTO, as applicable, and certain costs and disbursements related to the foregoing, up to the Statutory Cap per Employee, (b) any claims or payments pursuant to the Employee Benefit Plans, (c) all Benefits Withholding Obligations ((a), (b) and (c) collectively referred to as the "**Employee Obligations**"), (d) the Reimbursable Expenses, and (e) any prepetition claims for Independent Contractors, up to the Statutory Cap.

     **i.  Employees**

71.     The Debtors primarily operate in California and Connecticut.

72.     As of the Petition Date, NCDI's workforce is comprised of approximately 158 full-time employees (the "**NCDI Employees**") and two (2) individuals who work with NCDI as independent contractors (the "**Independent Contractors**"), managing NCDI's 401(k) program and payroll/human resources/manufacturing operating system, respectively.  Valley's workforce is comprised of approximately 65 full-time employees (the "**Valley Employees**" and together with the NCDI Employees, the "**Employees**").  None of the Employees are unionized.

73.     NCDI Employees are co-employed by ADP, LLC ("**ADP**").   ADP is a professional employer organization engaged by NCDI to administer a broad range of human

NY 246430506v1

resources and benefits administration services.  In the co-employment arrangement, NCDI maintains day-to-day control over, dictates the roles and responsibilities of and manages the NCDI Employees, while ADP handles certain human resources management and benefits administration responsibilities.

      **ii.  Wages and Payroll Obligations**

        **a. NCDI**

74.    NCDI Employees are paid wages or salaries (collectively, the "**NCDI Wages**") bi-weekly, every other Friday.  NCDI's average payroll for the NCDI Wages is approximately $450,000.  NCDI's most recent payroll payment was made on March 17, 2017, for the payroll period ending March 11, 2017.  The next payroll payment is scheduled for March 31, 2017.  As of the Petition Date, approximately $450,000 in NCDI Wages is accrued and owed to NCDI Employees.

75.    The Independent Contractors are paid through accounts payable, not through NCDI's payroll.  One of the Independent Contractors invoices NCDI for fees accrued on account of services performed and is also reimbursed for any accrued mileage.  On average, NCDI spends approximately $3,000 per month for such Independent Contractor's fees and mileage. The other Independent Contractor receives a monthly retainer of $2,500, which is paid on the first (1st) of each month, and invoices NCDI for consulting and development fees as well as expenses incurred when such Independent Contractor works onsite.  On average, NCDI spends approximately $6,000 per month for the services of this Independent Contractor.  As of the Petition Date, the aggregate amount owed to the Independent Contractors is less than $15,000 and no amount owing to either Independent Contractor exceeds the Statutory Cap.

76.     ADP pays the NCDI Payroll Taxes to the NCDI Taxing Authorities on behalf of NCDI. As with the NCDI Wages, ADP draws funds for the NCDI Payroll Taxes directly from NCDI accounts and remits payment directly to the NCDI Taxing Authorities. NCDI's average monthly obligation for NCDI Payroll Taxes is approximately $95,000. As of the Petition Date, NCDI has accrued approximately $47,500 in NCDI Payroll Taxes.

### b. Valley

77.     Valley Employees are paid wages or salaries (collectively, the "**Valley Wages**" and together with the NCDI Wages, the "**Wages**") every Thursday. Valley's average payroll is approximately $90,000, excluding Valley Payroll Taxes. Valley's most recent payroll payment was made on March 23, 2017, for the payroll period ending March 16, 2017. The next payroll payment is scheduled for March 30, 2017. As of the Petition Date, approximately $108,000 in Valley Wages is accrued and owed to Valley Employees, with no Valley Employee owed in excess of the Statutory Cap.

78.     Valley uses Paychex, Inc. ("**Paychex**") as its payroll processor. Paychex, on behalf of Valley, remits the Valley Payroll Taxes to the Valley Taxing Authorities weekly and files returns quarterly. On average, Paychex withholds approximately $97,000 per month on account of Valley Payroll Taxes. As of the Petition Date, Paychex has withheld and continues to hold approximately $40,000 of Valley Payroll Taxes to be remitted to the Valley Taxing Authorities.

### iii. Paid Time Off

### a. NCDI

79.     After a 90 day probation period, NCDI Employees begin to accrue paid time off ("**NCDI PTO**"). NCDI Employees may use NCDI PTO each year for any reason, including, but

not limited to, vacation, observance of religious holidays, illness or injury or the illness or injury of dependents or family members.  NCDI PTO is capped at different amounts for NCDI Employees depending on (i) years of service and (ii) type of NCDI Employee.  Generally, NCDI Employees accrue up to 40 hours of NCDI PTO in their first year of employment, up to 80 hours of NCDI PTO in their second through ninth year of employment, and up to 120 hours of NCDI PTO in their tenth year of employment and thereafter.

80.      Each year, NCDI Employees are paid out any accrued but unused NCDI PTO on their respective hire date anniversaries.  With respect to employee departures, NCDI pays out accrued but unused NCDI PTO.  As of the Petition Date, NCDI estimates approximately $201,000 in NCDI PTO is accrued and outstanding.

### b. Valley

81.      After a 90 day probation period, full-time Valley Employees begin to accrue paid time off ("**Valley PTO**" and together with the NCDI PTO, the "**PTO**") at a rate of 1.5 hours for every 40 hours worked.  Eligible Valley Employees may use Valley PTO each year for any reason, including, but not limited to, vacation, observance of religious holidays, illness or injury or the illness or injury of dependents or family members.  Valley PTO is capped at different amounts for eligible Valley Employees depending on (i) years of service and (ii) type of Valley Employee.  Generally, full-time Valley Employees can accrue up to 40 hours of Valley PTO after their first year of employment, up to 80 hours of Valley PTO for their second and third year of employment, up to 120 hours of Valley PTO for their fourth through tenth year of employment, and up to 160 hours of Valley PTO for their eleventh year of employment and thereafter, if applicable.

27

82.     For most eligible Valley Employees, accrued but unused Valley PTO in a calendar year may not be carried over, but is paid out at year end.  Certain eligible Valley Employees may carry over up to 40 hours of accrued but unused Valley PTO.  With respect to employee departures, Valley pays for accrued but unused Valley PTO.  As of the Petition Date, Valley estimates that approximately $30,000 in Valley PTO is accrued and outstanding.

### iv.  Employee Benefit Plans

#### a. Medical/Dental/Vision

##### i.  NCDI

83.     Beginning on the 1st of the month after completing one (1) full month of employment, NCDI Employees are eligible to participate in the NCDI Employee Benefit Plans, including, among other benefits, medical, dental and vision plans, workers' compensation insurance, life insurance, disability insurance, and retirement plans.

84.     Eligible NCDI Employees and their dependents are offered medical coverage through a either a PPO or an HMO, which are administered by Aetna (collectively, the "**NCDI Medical Plan**").  137 NCDI Employees are enrolled in the NCDI Medical Plan.  With respect to the $112,000 average monthly premium, NCDI is responsible for approximately $88,000 and participating NCDI Employees are responsible for $24,000, which amount is aggregated through deductions from each participating NCDI Employee's paycheck.

85.     NCDI Employees and their dependents are also offered dental benefits through Guardian (the "**NCDI Dental Plan**").  118 NCDI Employees are enrolled in the NCDI Dental Plan.  With respect to the $8,000 average monthly premium, NCDI is responsible for approximately $3,200 and participating NCDI Employees are responsible for $4,800, which amount is aggregated through deductions from each participating NCDI Employee's paycheck.

NY 246430506v1

86.     NCDI Employees and their dependents are also offered vision benefits through VSP Vision Care (the "**NCDI Vision Plan**", and together with the NCDI Medical Plan and the NCDI Dental Plan, the "**NCDI Employee Health Plans**").  134 NCDI Employees are enrolled in the NCDI Vision Plan.   With respect to the $1,900 average monthly premium, NCDI is responsible for approximately $1,200 and participating NCDI Employees are responsible for $700, which amount is aggregated through deductions from each participating NCDI Employee's paycheck.  The Debtors believe that there are no accrued and unpaid costs associated with the NCDI Employee Health Plans as of the Petition Date.

ii.  *Valley*

87.     Beginning on the 1st of the month after completing 60 days of employment, Valley Employees are eligible to participate in the Valley Employee Benefit Plans, including, among other benefits, medical, dental and vision plans, workers' compensation insurance, life insurance, disability insurance, and retirement plans.

88.     Eligible Valley Employees and their dependents are offered medical coverage through Connecticare (collectively, the "**Valley Medical Plan**").   47 Valley Employees are enrolled in the Valley Medical Plan.  With respect to the $39,000 average monthly premium, Valley is responsible for approximately $33,000 and participating Valley Employees are responsible for $6,000, which amount is aggregated through deductions from each participating Valley Employee's paycheck.

89.     Valley Employees and their dependents are also offered dental benefits through Aetna (the "**Valley Dental Plan**").  20 Valley Employees are enrolled in the Valley Dental Plan. With respect to the $2,500 monthly premium, Valley is responsible for approximately $300 and

participating Valley Employees are responsible for $2,200, which amount is aggregated through deductions from each participating Valley Employee's paycheck.

90.     Valley Employees and their dependents are also offered vision benefits through US Health (the "**Valley Vision Plan**", and together with the Valley Medical Plan and the Valley Dental Plan, the "**Valley Employee Health Plans**").  12 Valley Employees are enrolled in the Valley Vision Plan.  With respect to the $150 monthly premium, Valley is responsible for approximately $30 and participating Valley Employees are responsible for $120, which amount is aggregated through deductions from each participating Valley Employee's paycheck.  The Debtors believe that there are no accrued and unpaid costs associated with the Valley Employee Health Plans as of the Petition Date.

### b. Flexible Spending Accounts and Health Savings Accounts

#### i. NCDI

91.     NCDI offers NCDI Employees the ability to contribute a portion of their (pre-tax) NCDI Wages, which amounts are generally deducted automatically from each paycheck of participating NCDI Employees until the federal maximum allowed to accrue is met, into a flexible spending account (each an "**NCDI FSA**") to be used for health care.  Only one (1) NCDI Employee currently has an NCDI FSA.  NCDI is not obligated to pay any amounts on account of the NCDI FSA and does not monitor or accrue the NCDI FSA for the participating NCDI Employee.

92.     NCDI offers NCDI Employees the ability to contribute a portion of their (pre-tax) NCDI Wages, which amounts are generally deducted automatically from each paycheck of participating NCDI Employees until the federal maximum allowed to accrue is met, into a health savings account (each an "**NCDI HSA**") to be used for health care.  Only one (1) NCDI

Employee currently has an NCDI HSA.  NCDI is not obligated to pay any amounts on account of the NCDI HAS and does not monitor or accrue the NCDI HSA for the participating NCDI Employee.

*ii. Valley*

93.   Valley offers Valley Employees the ability to contribute a portion of their (pre-tax) Valley Wages, which amounts are generally deducted automatically from each paycheck of participating Valley Employees until the federal maximum allowed to accrue is met, into a health savings account (each a "**Valley HSA**") to be used for health care.  51 Valley Employees currently contribute to a Valley HSA.  Valley makes quarterly payments on account of the Valley HSA with the next payment of approximately $31,500 coming due April 1, 2017.

### c. Workers' Compensation Insurance

*i. NCDI*

94.   NCDI Workers' Compensation Insurance covers all NCDI Employees and is provided through ADP's services.  NCDI pays ADP approximately $52,000 per month for the NCDI Workers' Compensation Insurance.

*ii. Valley*

95.   Valley Workers' Compensation Insurance covers all Valley Employees and is provided through The Hartford Company.  Paychex, on behalf of Valley, pays The Hartford Company approximately $12,100 per month for the Valley Workers' Compensation Insurance.

### d. Other Insurance Plans

*i. NCDI*

96.   NCDI offers NCDI Employees long-term disability insurance (the "**NCDI Disability Plan**").  After an eligible NCDI Employee has been injured or disabled for 180

continuous days and unable to work, the NCDI Disability Plan provides eligible NCDI Employees with payments ranging from a minimum of $100 to a maximum of $1,000 per pay period for up to 24 months.  On average, NCDI pays approximately $350 per month on account of the NCDI Disability Plan.

97.     After the general benefits probation period, NCDI Employees who work 30 or more hours per week are provided with basic life insurance through Aetna (the "**NCDI Life Insurance**").  Benefits provided by the NCDI Life Insurance are based on 1x an eligible NCDI Employee's annual base earnings.  On average, NCDI's monthly obligation on account of the NCDI Life Insurance is $1,000.  The Debtors believe that there are no accrued and unpaid monthly premiums in connection with either the NCDI Disability Plan or the NCDI Life Insurance.

### ii. Valley

98.     Valley offers Valley Employees the opportunity to purchase short-term and long-term disability insurance as well as supplemental insurance (collectively, the "**Valley Supplemental Insurance**") with AFLAC.  18 Valley Employees receive the Valley Supplemental Insurance.  The average monthly fee for the Valley Supplemental Insurance is $1,700, which amount is deducted from participating Valley Employees' paychecks.  As of the Petition Date, Valley estimates that approximately $1,550 is accrued and unpaid in connection with the Valley Supplemental Insurance.

99.     After a 90 day probation period, Valley Employees are provided with basic life insurance through The Hartford Company (the "**Valley Life Insurance**").  The Valley Life Insurance provides Valley Employees with up to $10,000 in benefits and permits Valley

Employees to purchase supplemental benefits.    The next monthly premium payment of approximately $800 is due on April 1, 2017.

### e. Retirement Plans

#### i. NCDI

100.    The NCDI 401(k) Plan is administered by Empower 401(k).  After a probation period of 90 days, NCDI Employees over the age of 18 may contribute funds to the NCDI 401(k) Plan through wage deferrals up to the IRS limit.  72 NCDI Employees are enrolled in the NCDI 401(k) Plan.  NCDI does not match NCDI Employee contributions.

#### ii. Valley

101.    Valley maintains 401(k) and Roth IRA retirement savings plans for the benefit of eligible Valley Employees.  The Valley Retirement Plans are administered by Paychex.  After a probation period of 90 days, Valley Employees who are 18 years of age or older may enroll in and contribute funds to the Valley Retirement Plans through wage deferrals up to the IRS limit. Approximately 55 Valley Employees are enrolled in and contribute to the Valley Retirement Plans.  Valley matches up to 3% of Valley Employee contributions on a weekly basis, incurring approximately $9,000 per month.

### v. Business and Reimbursable Expenses

#### a. NCDI

102.    NCDI reimburses NCDI Employees for certain ordinary course expenses incurred within the scope of NCDI Employees' employment, including travel, lodging, transportation, meals and other miscellaneous expenses (collectively, the "**NCDI Reimbursable Expenses**"). NCDI Reimbursable Expenses incurred by NCDI Employees in furtherance of NCDI's business are paid directly by NCDI Employees who then submit expense reports to NCDI, in accordance

33

with NCDI's reimbursement policy.  As of the Petition Date, NCDI estimates that a nominal amount will be outstanding on account of NCDI Reimbursable Expenses.

103.    Additionally, NCDI provides certain NCDI Employees with corporate credit cards (collectively, the "**NCDI Expense Cards**") that the NCDI Employees may use to directly charge NCDI for certain business expenses.  NCDI typically pays the issuers of the NCDI Expense Cards directly each day for charges incurred by NCDI Employees using the NCDI Expense Cards.  Certain NCDI Employees may be independently liable for the charges incurred on the NCDI Expense Cards.  On average, NCDI spends approximately $21,000 per month with respect to the NCDI Expense Cards and $7,000 in connection with NCDI Reimbursable Expenses.  As of the Petition Date, NCDI estimates that a nominal amount will be outstanding on account of charges incurred on the NCDI Expense Cards.

### b. Valley

104.    Valley reimburses Valley Employees for certain ordinary course expenses incurred within the scope of employment, including travel, lodging, transportation, meals and other miscellaneous expenses (collectively, the "**Valley Reimbursable Expenses**" and together with the NCDI Reimbursable Expenses, the "**Reimbursable Expenses**").  Valley Reimbursable Expenses incurred by Valley Employees in furtherance of Valley's business are paid directly by Valley Employees who then submit expense reports to Valley, in accordance with Valley's reimbursement policy.  As of the Petition Date, Valley estimates that a nominal amount will be outstanding on account of Valley Reimbursable Expenses.

105.    Additionally, Valley permits certain Valley Employees to incur charges for business-related expenses using one of ten (10) corporate credit cards (collectively, the "**Valley Expense Cards**" and together with the NCDI Expense Cards, the "**Expense Cards**")).  Valley

34

typically pays the issuers of the Valley Expense Cards directly each day for charges incurred by Valley Employees using the Valley Expense Cards.   Certain Valley Employees may be independently liable for the charges incurred on the Valley Expense Cards.  On average, Valley spends approximately $63,000 per month with respect to the Valley Expense Cards and $500 in connection with Valley Reimbursable Expenses.  As of the Petition Date, Valley estimates that a nominal amount will be outstanding on account of charges incurred on the Valley Expense Cards.

### vi. Miscellaneous Expenses

#### a. NCDI

106.   NCDI provides one (1) NCDI Employee with a $700 per month car allowance. Additionally, eleven (11) NCDI Employees are provided with a company cell phone and nine (9) NCDI Employees receive a cell phone allowance; NCDI's monthly expense in connection with these cell phone expenses is approximately $800 per month.   NCDI estimates that as of the Petition Date, approximately $700 is accrued and outstanding on account of employee cell phones.

#### b. Valley

107.   Valley provides one (1) Valley Employee with a $750 per month car allowance. Additionally, five (5) Valley Employees receive a cell phone allowance of approximately $550, in the aggregate, per month.  Valley estimates that as of the Petition Date, there is no amount accrued and outstanding on account of the cell phone allowance; the next payment is due April 6, 2017.

*NY 246430506v1*

**I. Application of the Debtors for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Authorizing the Employment and Retention of BMC Group, Inc., as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date**

108.    By this Application, the Debtors seek entry of an order authorizing the employment and retention of BMC Group, Inc. ("**BMC**") as the Claims and Noticing Agent in these Chapter 11 Cases.  I understand that the Debtors and their advisors obtained and reviewed engagement proposals from four court-approved claims and noticing agents to ensure selection of a Claims and Noticing Agent through a competitive process.

109.    The Debtors and their advisors reviewed BMC's engagement letter and description of services that BMC will render in these Chapter 11 Cases, BMC's compensation and other terms of the engagement.  Following that review, and in consideration of the number of anticipated notice parties, the nature of the Debtors' business, and BMC's competitive and reasonable rates given their quality of services and expertise, the Debtors selected BMC to act as the Debtors' Claims and Noticing Agent.

110.    I believe that the retention of BMC as Claims and Noticing Agent is necessary and in the best interest of the estates.  BMC will relieve the burdens associated with claims and noticing services, allowing the Debtors to devote their attention and resources to maximize value for their stakeholders and facilitate the orderly administration of these Chapter 11 Cases.

**J. Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Greenberg Taurig, LLP As Counsel for the Debtors and Debtors-in-Possession *Nunc Pro Tunc* the Petition Date**

111.    By this Application, the Debtors seek entry of an order authorizing the employment and retention of Greenberg Traurig, LLP ("**Greenberg Traurig**") as counsel to the Debtors in these Chapter 11 Cases.

NY 246430506v1

112.    Greenberg Traurig has extensive experience and knowledge in the field of debtor and creditor rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Prior to the commencement of these Chapter 11 Cases, Greenberg Traurig assisted the Debtors in their negotiations with their secured creditors and other stakeholder groups, and in preparing for the filing of these Chapter 11 Cases.  In these and other matters, Greenberg Traurig's professionals have worked closely with the Debtors' management and other professionals and, as a result, have become well acquainted with the Debtors' history, business operations, capital and corporate structure and related matters.  Accordingly, Greenberg Traurig has developed substantial knowledge regarding the Debtors that will result in effective and efficient services in these Chapter 11 Cases.

113.    In connection with its engagement, Greenberg Traurig has undertaken a conflicts check that compares certain Potentially Interested Parties against a list of Greenberg Traurig's current and former engagements, clients, and adverse parties.  Additionally, Greenberg Traurig solicited information from its attorneys to determine whether any attorneys employed by Greenberg Traurig are related to the Bankruptcy Judge presiding over these Chapter 11 Cases, the United States Trustee for Region 3, or any attorney known by Greenberg Traurig to be employed in the Office of the United States Trustee serving the District of Delaware or are equity security holders of any of the Debtors.  To the best of the Debtors' knowledge, Greenberg Traurig (a) does not hold or represent any interest adverse to the Debtors or their chapter 11 estates, their creditors or any other party-in-interest in connection with these Chapter 11 Cases, and (b) is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.

NY 246430506v1

114.   The Debtors hired Greenberg Traurig because Greenberg Traurig is well suited for the type of representation required by the Debtors.   Greenberg Traurig has the necessary resources and experience to assist the Debtors in these Chapter 11 Cases.   For this reason, Greenberg Traurig's employment is in the best interests of the Debtors, their estates, and their creditors.

**K. Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 522 (I) Authorizing the Debtors to Obtain Secured Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief**

115.   The Debtors have an urgent and immediate need to obtain postpetition financing because they do not have sufficient funds on hand or generated from their business to fund operations.   Without the financing proposed by the motion, the Debtors will not have the funds necessary to continue their operations or conduct a reasonable sales process.   The Debtors' ability to continue their operations, to conduct a reasonable sales process, to maintain business relationships, to make payroll, to pay the costs of administration of their estates and to satisfy other working capital and operational needs, depends on obtaining access to the DIP Facility and the continued use of cash collateral.   The access of the Debtors to sufficient working capital and liquidity through the use of cash collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital for preserving and maintaining the going concern values of the Debtors for the benefit of their estates.   Failure to obtain the relief requested in the motion will harm (a) the Debtors, their estates, creditors and equity holders, and (b) the possibility of a near-term value-maximizing transaction.

116.   The proposed Interim Order provides superpriority administrative expense claim status in the chapter 11 cases to all obligations of the Debtors to the DIP Lender arising under the

38

*NY 246430506v1*

DIP Facility, automatically perfected first-priority security interests in and liens on all of the Collateral to secure all DIP Obligations, which liens and security interests shall be subject to Permitted Liens and the Carve-Out, and certain adequate protection to the for the Prepetition Agent and Prepetition Lenders on account of the Prepetition Liens being primed, on account of the automatic stay, and on account of the use of their collateral to the extent of any diminution in the value of such collateral.   Prior to the Final Hearing, the Debtors propose to make distributions pursuant to the Approved Budget subject to certain Permitted Variances.

117.    Access to the proposed postpetition financing and us of Collateral on an interim basis, and ultimately on a final basis, will provide the Debtors with the liquidity necessary to maintain operations pending the outcome of an orderly sale process that will maximize value for all constituents.

### IV.    CONCLUSION

118.    For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving the objectives set forth in Part II for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  March 28, 2017                                       */s/ Matthew D. Sedigh*
                                                            Matthew D. Sedigh
                                                            Chief Restructuring Officer

**<u>Exhibit A</u>**

**Organizational Chart**

# Organizational Chart of the Debtors – as of March 28, 2017

